BELLAIRE SECURITIES CORPORATION, *et al.,* v. RAYMOND P.
BROWN, *et al.*

168 So. 625.
Opinion Filed February 20, 1936.
On Rehearing June 12, 1936.

*William Fisher,* for Appellants;

*Justus Chancellor* and *Beggs & Beggs,* for Appellees.

BROWN, J.—Bellaire Securities Corporation brought its bill of complaint against Raymond P. Brown and William H. Brown, residents of Illinois; Frank S. Bond, a resident of Erie, Pa.; Bayview Improvement Co., a Florida corporation; G. W. Johnson and B. M. Askew, of Walton County, Florida, and West Florida Naval Stores Co., a Florida corporation, praying that the first mortgage which it holds on a certain described tract of land, known as the Bayview tract, located in Walton County, Florida, be foreclosed.

The pertinent allegations of the bill are in substance that Raymond P. Brown and William H. Brown on July 1, 1925, being indebted to Charles E. Cessna in the sum of $63,000.00, executed and delivered to him their seven promissory notes aggregating this amount, and to secure payment of said notes, Raymond P. Jones, joined by his wife, did on July 1, 1925, execute and deliver to Charles E. Cessna a mortgage on the "Bayview tract," containing 8,736.5 acres, more or less, and lying in Walton County; that the mortgagors covenanted that upon failure to pay either principal or interest, the whole mortgage debt should become immediately due and payable, which debt should include all costs, expenses and attorney's fees; that subsequent to the execution and delivery of said mortgage, Raymond P. Brown conveyed the "Bayview tract" to the Bayview Improvement Co., and the latter executed and delivered a second mortgage on said land to Raymond P. Brown, executed a third mortgage to Frank S. Bond and executed to G. W. Johnson a turpentine lease on said land, which was by G. W. Johnson and B. M. Askew, trading as Freeport Naval Stores Co., mortgaged to West Florida Naval Stores Co.; that William H. Brown claims some interest in the

mortgage and is made a party; that all of these claims were inferior to that of Charles E. Cessna; that prior to the maturity of any of the notes, Charles E. Cessna assigned the $63,000.00 mortgage and the indebtedness secured thereby to complainant, who has been the holder thereof since May, 1926; that Raymond P. Brown, W. H. Brown and Bayview Improvement Co. defaulted in the principal payments due on November 10th of the years 1926, 1927 and 1928, and also defaulted in payment of interest, thereby causing all amounts to become immediately due and payable; that there is due complainant $63,000.00 principal, with 6% interest from November 10, 1925, and 10% solicitors' fees.

A decree *pro confesso* was taken against Frank S. Bond, G. W. Johnson, B. M. Askew and West Florida Naval Stores Co., who failed to appear or answer the bill of complaint.

Raymond P. Brown and William H. Brown filed their joint and several answer and cross bill in which they, after admitting all allegations of the bill, except those contained in paragraphs 6, 7 and 8, denied that the mortgage from Bayview Improvement Co. to Raymond P. Brown is inferior to and subject to the mortgage from Raymond P. Brown to Charles E. Cessna and demanded strict proof thereof; and in answering the bill, alleged that in July, 1925, Raymond P. Brown contracted to sell the "Bayview tract" to Jesse A. Root for $265,335.00, and as part of the agreement, Raymond P. Brown obligated himself to place a $63,-000.00 mortgage thereon which Root agreed to and assumed to pay; and pursuant to that agreement, that mortgage, which is now sought to be foreclosed upon, was executed by Raymond P. Brown and wife, Pearletta, and W. H. Brown to Charles E. Cessna; that upon information and belief, Jesse A. Root, on September 14, 1925, without the

knowledge of Brown, assigned the contract to Z. D. Adair, and on November 17, 1926, Z. D. Adair and Frank S. Bond assigned said contract to Bayview Improvement Co.; that Jesse A. Root represented to Raymond P. Brown that he had business men of financial ability, namely Frank S. Bond, Z. D. Adair, Neely Bowen, Burton A. Howe, J. M. Studebaker, Frank G. Jones and others, associated with him, who would take over the property if he would discount $26,535.50 from the purchase price thereof, which was agreed to, and further representing that they would organize a corporation to take title to the land, but that the men would supply the money with which to carry out the contract; and relying upon said representations, after receiving from Jesse A. Root and his associates the initial payment of upwards of $50,000.00, conveyed the property to the Bayview Improvement Co., and the latter executed and delivered to Raymond P. Brown a mortgage thereon for $112,000.00, which was security for four promissory notes aggregating that amount; that upon being advised by Charles E. Cessna on May 10, 1926, that the interest payment on the $63,000.00 mortgage had not been paid, Raymond P. Brown forwarded a check for $1,894.73 to Charles E. Cessna to prevent a default; that on information and belief, on May 11, 1926, Neely Bowen, Jesse A. Root and their associates induced Charles E. Cessna to assign said notes and mortgage in blank and forward them with draft to the Central Union Trust Co., which was done and the draft paid; that Charles E. Cessna believing the mortgage had been sold to Neely Brown, forwarded the check in payment of interest to him; that Raymond P. Brown being informed that Root or some of his associates had taken over the notes and mortgage and that they hadn't decided what to do with them, and being unable to have the check

in payment of interest returned, had payment on it stopped; that thereafter Neely Bowen represented to Raymond P. Brown that because of the slump of land values in Florida, they were unable to sell the land and bought up the first mortgage to protect themselves, and proposed that if Brown would not press his mortgage for collection, neither would they; that upon information and belief the Florida Farm Mortgage Co. presented the check for $1,894.73 in payment of interest to the American National Bank of Pensacola, but payment thereon was refused; that upon information and belief the Bayview Improvement Co., at the time it took title to the land and gave Brown a mortgage thereon for $112,000.00, was a sham, without capital and substance to warrant such transactions, being incorporated for only $15,000.00 and without capital; and that the cash payment to Brown was made by Root and his associates, and they are using the Bayview Improvement Co. to defraud Brown out of the land and the balance due thereon as evidenced by the mortgage, by delivering into the hands of Bellaire Securities Corporation the first mortgage and notes representing that indebtedness and causing these foreclosure proceedings to be begun; that since payment of the money for the first mortgage and notes to Charles E. Cessna by the Central Union Trust Co., Neely Bowen has represented that Burton A. Howe and various other associates held said mortgage, but did not intimate that Bellaire Securities Corporation had any interest therein; that at no time has Bellaire Securities Corporation ever presented the same to defendants for payment, and that it is acting only as agent or trustee of Root and his associates, and is not a *bona fide* purchaser for value of the mortgage and is not entitled to foreclose the same; that the title and right of Bellaire Securities Corporation is subject to the equities

between Raymond P. Brown and Root and his associates; that the interests of complainant and Root and his associates in said mortgage is subject to the mortgage given Raymond P. Brown by the Bayview Improvement Co.

Raymond P. Brown, by way of cross relief, seeks to foreclose his mortgage as a superior lien against the land, asking that process be issued against Jesse A. Root, Neely Bowen, Burton A. Howe, J. M. Studebaker, Frank G. Jones, Z. D. Adair and the Florida Farm Mortgage Co., who had not made any appearance in the case up to that time.

The answer and cross bill was amended by substituting the name of Eugene Curtis, executor, for that of Nina K. Jones, deceased; and by substituting the estate of Frank S. Bond for the name of Frank S. Bond.

Decree *pro confesso* was taken against Jesse A. Root, J. M. Studebaker and Frank G. Jones, for failure to appear or answer the bill of complaint.

Bellaire Securities Corporation answered the answer and cross bill of defendants, the substance of the allegations being that complainant and answerer was a *bona fide* purchaser before maturity and holder of the first mortgage and notes; that the officers of complainant are now K. E. Fenderson, President, Helen C. Perry, Vice-President, V. C. Barrett, Secretary and Treasurer; and at the time of the purchase of the first mortgage was Burton A. Howe, President, Elizabeth C. Howe, Vice-President, William A. Strauss, Jr., Secretary-Treasurer, and E. C. Hanley, Assistant Secretary-Treasurer, and other than these no one except Burton A. Howe, who owns all of the stock in complainant, has been interested in complainant; that neither Jesse A. Root, Frank S. Bond, Neely Bowen, Z. D. Adair, J. M. Studebaker, Frank G. Jones, Florida Farm Mort-

gage Co., Bayview Improvement Co. nor any other person, except as hereinbefore stated, has ever been interested in complainant, the first mortgage or notes; that complainant specifically denies the allegations of paragraphs 4-13 of the answer and cross bill; that upon information and belief the Bayview Improvement Co. was organized, as the Browns well knew, to purchase the "Bayview tract"; that the cash payment plus the assumption of a first mortgage and the giving of a second and third mortgages, constituting the purchase price, was raised by the sale of common stock for approximately $98,000.00, the purchasers being Frank G. Jones, Burton A. Howe, Warren H. Snow, George W. Davidson, Earl C. Eiffert, I. C. Bradbury and George C. Thomson, none of them being associated or connected with Root, Bond, Duncombe or McGill; that complainant purchased said mortgage because Burton A. Howe owned some of the stock of Bayview Improvement Co., but the latter had no connection with the transaction; that since the purchase of said mortgage, defendant Brown owes complainant instead of Charles E. Cessna; that upon information and belief the Browns were real estate agents of Charles E. Cessna, the original owner of the property, and that instead of selling the land as agent for Cessna, they contracted to purchase it from him for approximately $125,000.00 and thereafter contracted with Jesse A. Root for the sale of the property for $265,000.00; that they purchased the property, giving Cessna a mortgage thereon for $63,000.00, and received therefor approxmiately $90,000.00 in cash and a second mortgage for $112,000.00; that prior to the time the trade with Root and his associates was closed, they had an opportunity to dispose of the land through Neely Bowen, as agent, the contract with Root being assignable, so that all the trades were closed simultaneously, the Browns ac-

cepting expressly the obligations of the Bayview Improvement Co., as purchaser of the property; that the trade was closed by Bayview Improvement Co. assuming the first mortgage of $63,000.00 given by Brown to Charles E. Cessna, giving a $112,000.00 second mortgage to the Browns and giving a $120,000.00 third mortgage to Root and his associates; that in addition the Bayview Improvement Co. paid Root and his associates approximately $98,000.00 cash, the latter paying the Browns approximately $88,000.00, out of which the Browns paid part of what they owed Cessna; that each of the trades was separate and distinct, and the Browns knew and expressly accepted them; that any contrary statements found in the answer and cross bill are untrue; that upon information and belief, Root was acting as the agent of Brown to persuade Bond and his associates to buy the land.

Burton A. Howe adopted as his own the answer of Bellaire Securities Corporation to the answer and cross bill of defendants.

The Florida Farm Mortgage Co., in addition to alleging in its answer many facts that were alleged in the answer of Bellaire Securities Corporation, also alleged that it was a corporation, created by William A. Fisher, counsel for complainant, and whose stockholders are composed solely of members of his own family; that its bank account is used on occasions for the purpose of keeping funds of clients of William A. Fisher separate from his own personal funds; that the interest check was found among the mortgage papers sent him to foreclose and he deposited it in this account in the American National Bank of Pensacola.

Neely Bowen and Z. D. Adair answered the answer and cross bill, denying the truth of all matters of fact found in paragraphs 4-13 of the answer and cross bill; and alleging

that the answerers were real estate dealers in Pensacola in 1925; that prior to 1925, the Browns as real estate dealers were supposed to be in charge of certain lands belonging to Charles E. Cessna, and thereafter purchased said property, and before these answerers became connected with it, the Browns made a contract of sale therefor to Jesse A. Root, who represented himself, Frank S. Bond, Frank A. Duncombe and Edward E. McGill; that upon information and belief, Root was the agent of the Browns in getting Root's associates interested; that Root entered negotiations with these answerers to sell them the land; that Neely Bowen interested certain parties, whose names, upon information and belief, are mentioned in complainant's answer, and who stated they would purchase said property if title thereto was approved and if Neely Bowen would organize a corporation through which purchase could be made; that thereafter Bayview Improvement Co. was organized for the express purpose of taking title to said land, and was put in funds to make said purchase by the purchase of common stock by various persons who paid therefor approximately $98,-000.00; that the trades were all closed at the same time in the offices of William Fisher, as the Browns knew, by Root and his associates using the money paid them by Bayview Improvement Co. to pay a greater portion to Brown, and Brown using such of the money as he needed to pay Cessna, at which time William H. Brown represented himself and Raymond P. Brown in closing the transaction, title to the land being in the latter; and that William H. Brown knew all of the circumstances of the respective transactions and the relations of the parties, that Bayview Improvement Co. was organized solely to make purchase of the land; and William H. Brown acquiesced in the transfer of title from Raymond P. Brown to Bayview Improvement Co., the col-

lection of the money through Root and his associates, the assumption of the $63,000.00 first mortgage by Bayview Improvement Co., the giving of a second mortgage for $112,000.00 to the Browns, representing a portion of their profits, and the giving of a third mortgage to Root and his associates.

On July 5, 1930, the Browns, through their solicitors, applied for leave to amend their answer and cross bill, to which application the complainant filed objections.

The court ordered, on July 8, 1930, that action on said application for leave to amend would be deferred until the cause was presented on final hearing.

Testimony in the cause was taken before a Special Examiner; and by depositions of several parties who could not appear before the Special Examiner.

After the testimony and depositions were taken, the court then granted the defendants leave to amend their answer and cross bill.

The defendants Brown amended their joint and several answer and cross bill by making Bellaire Securities Corporation, Bayview Improvement Co., Frank S. Bond, Jesse A. Root, E. E. McGill, F. A. Duncombe, Neely Bowen, Burton A. Howe, the Administrator *ad litem* of the estate of Frank G. Jones when appointed, Nina K. Jones, Warren H. Snow, George W. Davison, Earl C. Eifert, I. C. Bradbury, George C. Thomson, Z. D. Adair, Florida Farm Mortgage Co., H. B. Davison and Atlantic Securities Corporation parties thereto; by striking therefrom paragraphs 4-11 and substituting therefor the following allegations, the substance of which are: that in July, 1925, Raymond P. Brown contracted to sell Jesse A. Root the "Bayview tract" for $265,335.00, which contract provided that Brown might give a first mortgage on the land which Root should assume

as part of the purchase price, and such mortgage was executed for $63,000.00; that thereafter Root assigned in writing the contract to Z. D. Adair, in which assignment it was agreed that all material conditions and provisions of the agreement between Brown and Root were made a part thereof; that upon information and belief, Neely Bowen, by authorization of Frank G. Jones and Burton A. Howe and their associates, entered into an agreement with Z. D. Adair for the purchase of said land and assignment of the Brown-Root and the Root-Adair contracts, and paid Adair $10,000.00 on account, which was furnished by Jones and Howe and their associates; and caused Bayview Improvement Co. to be incorporated expressly to take title to the property, it being incorporated for $15,000.00, with each of the incorporators, Neely Bowen, Z. D. Adair and J. E. Adair, owning 50 shares of stock; that the purchase of the land was perfected by Bowen paying Z. D. Adair the further sum of $121,000.00 furnished by Howe and Jones and their associates, by taking an assignment of the two contracts in writing, and by Raymond P. Brown and wife deeding the property to Bayview Improvement Co., the latter assuming the $63,000.00 mortgage from Brown to Cessna as part of the purchase price, and executing to Brown a second mortgage for $112,000.00 for the balance due him and executing a third mortgage to Frank S. Bond for $120,-718.00; that simultaneously therewith, the stock of Bayview Improvement Co. was forwarded to Burton A. Howe, who holds it for himself, the estate of Frank G. Jones and their associates; that about May 10, 1926, Neely Bowen, upon authority and instruction of Howe, procured an assignment of the $63,000.00 mortgage from Charles E. Cessna, the sum being furnished by Howe; and that upon invitation of Howe, the stockholders of Bayview Improve-

ment Co., or their relatives or close associates participated in the purchase of the mortgage in the same relative proportion as their ownership of the stock; that the name of the assignee in the assignment of the mortgage was left blank, but, according to the instruction of Howe, was, just before institution of foreclosure proceedings, filled in with the name of "Bellaire Securities Corporation," as assignee, all stock of the latter being owned by Burton A. Howe; that Bellaire Securities Corporation did not pay any consideration for the assignment of said mortgage, but the money was advanced by the stockholders of Bayview Improvement Co. or their close associates or relatives in the same proportion in which they owned stock therein; that on or about May 10, 1926, the Browns forwarded the interest payment on the first mortgage to Charles E. Cessna, who in turn forwarded it to Neely Bowen; and being unable to learn from Bowen who had possession of the check, payment thereon was ordered stopped; that the Florida Farm Mortgage Co., as agent of Howe, Jones and their associates, in February, 1929, presented the check to the bank for payment, but payment thereon was refused; that since receiving the deed for the land, Bayview Improvement Co. has engaged in no business and has acquired no property and no funds whatever; that though the agreement to assume the mortgage for $63,000.00 to Cessna was made in the name of Bayview Improvement Co., yet in fact the obligation was that of Howe and Jones and their associates, which they were obligated to pay as part of the purchase price; but they are engaged in a scheme and are using Bellaire Securities Corporation and the Bayview Improvement Co. as a cloak for foreclosing said mortgage for the purpose of avoiding payment thereof.

A decree *pro confesso* was entered against Jesse A. Root

and Eugene Curtis as executor of the last will and testament of Nina K. Jones for failure to appear or to answer the amended answer and cross bill.

The court appointed W. D. Howe as Administrator *ad litem* of the estates of Frank G. Jones and Frank S. Bond; and dismissed the answer and cross bill as to J. M. Studebaker without prejudice.

The Administrator *ad litem* of the estates of Frank G. Jones and Frank S. Bond answered the amended answer and cross bill by stating that he was not advised as to any of the allegations and prayed strict proof thereof.

The Bayview Improvement Co. answered, denying every allegation of the amended answer and cross bill; and alleging that it was organized and incorporated at the expense of Neely Bowen, Z. D. Adair and J. E. Adair, who have been its officers and directors since its organization; that it has transacted regularly all necessary business in connection with its property, and has kept the taxes paid thereon; that the $63,000.00 first mortgage is still a valid, subsisting lien against the property of the Bayview Improvement Co., no part of which has been paid for by or for the account of, or with any funds of this cross defendant.

The Florida Farm Mortgage Co. adopted as its answer, the answer it had previously filed to the answer and cross bill of the defendants before amendment.

Neely Bowen and Z. D. Adair answered, denying the truth of all matters of fact alleged in paragraphs 4-10 of the amended answer and cross bill, and after realleging the various steps in the transactions, alleged in substance that Neely Bowen now owns and has owned since the Bayview Improvement Co. was organized, 20 shares of the capital stock thereof, and that he did not mislead the Browns, but that the latter acquiesced in every particular of the trans-

action, and that it was upon condition of their agreeing to such that Neely Bowen was able to procure the money to close the transaction; that Neely Bowen as President and Z. D. Adair and J. E. Adair as the other two officers, have been directors of Bayview Improvement Co. since its organization; that the Bayview Improvement Co. has done business by having its land turpentined, by giving an oil lease thereon and by selling timber therefrom; that said corporation was incorporated for only $15,000.00 in order to save charter fees; that the $98,000.00 that Z. D. Adair paid for the equity in the land provided a sound basis for the incorporation of said corporation for $98,000.00 instead of $15,-000.00, the ultimate purchasers paying $121,500.00 for 13/15 of the stock therein; that the Bayview Improvement Co. was not a sham and was organized for the express purpose of taking title to the land and of giving mortgages thereon, to which the Browns assented; that the $63,000.00 first mortgage was not paid, but was purchased in a legitimate way with *bona fide* intent; that none of the individuals advancing the purchase money for the mortgage was liable thereon; that the purchase of the first mortgage was for the purpose of evading foreclosure at the time and was as much for the benefit of the second mortgagee as of the first mortgage, and the Browns acquiesced therein.

Bellaire Securities Corporation answered the amended answer and cross bill, denying the allegations of paragraph 4-10 thereof and taking issue on paragraphs 1-3 of the original answer and cross bill; and after setting out the various steps of the transactions in detail, alleged in substance that the Browns well knew and consented to every step that was taken in connection with the sale of the land; that the beneficial ownership of said stock was after the

various transactions were closed, and has been since and is now as follows:

> Neely Bowen, 2/15 of the total or 20 shares
> F. G. Jones _____ 25% of 130 shares
> Burton A. Howe _____ 25% of 130 shares
> George W. Davison _____ 25% of 130 shares
> Atlantic Securities Corporation
> (and not Warren H.
> Snow) _____ 12¼% of 130 shares
> Earl C. Eiffert _____4 1/6% of 130 shares
> I. C. Bradbury _____ 4 1/6% of 130 shares
> George B. Thomson __ 4 1/6% of 130 shares

That the following persons purchased an interest in the mortgage from Burton A. Howe:

> Frank G. Jones _____$15,925.00
> H. B. Davison _____ 15,925.00
> W. H. Snow _____ 7,962.50
> E. C. Eiffert _____ 2,657.68
> I. C. Bradbury _____ 2,657.68
> G. B. Thompson _____ 2,657.68

That Neely Bowen, Atlantic Securities Corporation and George W. Davison, owners of stock in Bayview Improvement Co. never purchased any interest in the mortgage; and complainant denies that any stockholder of Bayview Improvement Co. ever became obligated for the payment of any of the mortgages given or assumed by said corporation.

Thereafter the court allowed further time for the taking of additional testimony to sustain or defeat the issues as made by the amended answer and cross bill and the several answers thereto.

After the arguments of counsel, the court entered final decree in which it found that the equities in the cause were with Raymond P. Brown and William H. Brown; that as against Raymond P. Brown and William H. Brown, the $63,000.00 mortgage executed by Raymond P. Brown and wife, Pearletta Brown, to Charles E. Cessna and the indebtedness thereby secured have been paid, and the mortgage ordered cancelled of record; that if within five days, one of the cross defendants does not pay to Raymond P. Brown the sum of $112,000.00, the land be sold to pay the same, and the rights of all cross defendants therein be foreclosed.

From this final decree, the complainant and cross defendants took this appeal.

Briefly stated, the vital contentions of the appellants are that under the facts of this case the lower court was in error in holding that the stockholders of the Bayview Improvement Company were personally responsible on the first mortgage given by Brown to Cessna and which, upon conveyance of the property to the Bayview Improvement Company, was assumed by the corporation; that the organization of the corporation to avoid personal liability, but not to evade any personal liability theretofore or thereafter incurred, was a valid and legitimate use of the incorporation laws of the State, and would not justify the disregard of the corporate entity; that when, later, the corporation was unable to pay the interest on the first mortgage, and it became in default, it was not fraudulent for some three-fourths of the stockholders, for the purpose of forestalling, for the time being, a foreclosure of the first mortgage held by Cessna, to buy, with their individual funds, a three-fourth's interest in the first mortgage (the other one-fourth interest being at the same time purchased by Mrs. Davison,

the wife of one of the stockholders), and that such purchase did not operate as a payment *pro tanto* of the mortgage, there being no personal responsibility on the part of the stockholders on the first mortgage obligation; that the act of the wife of one of the stockholders, who herself owned no stock in the corporate obligor, in purchasing in good faith with her own individual and separate funds a one-fourth interest in the first mortgage, would not, in any event, preclude her from enforcing her share of the mortgage lien merely because her husband was a stockholder.

It is further contended by appellants that where, as here, a corporation is regularly organized for the purpose of avoiding any personal obligation on the part of the proposed stockholders, and the persons taking the obligations of the corporation are advised of such purpose prior to taking such obligations; and when the cash money put into the transaction for the purchase of the corporate stock would not have been put into it, and the corporate obligations would not have been made, except upon the consent of such corporate obligee to accept solely the corporate responsibility, the corporate obligee, who has profited largely from the cash money so put into the transaction, cannot thereafter claim the right to look through the corporate entity of the corporation and claim the personal responsibility of the stockholders.

Appellants also contend that the court below erred in permitting the amendment of the appellees' answer and counter claim on the ground that the original set up as a basis for relief purported facts and raised issues on which the evidence was taken and the cause tried, and which the evidence definitely showed to be untrue, and that the amended answer and counter claim set up other and inconsistent facts, and changed the issues.

On the other hand, the appellees contend that the court below should be affirmed; that, under the evidence in the case, the chancellor committed no error in looking through the legal fiction of the corporate entities, and holding that the stockholders of the Bay View Improvement Company were personally liable for the payment of the first mortgage from Brown to Cessna, because they were the members of the syndicate which, as co-adventurers, purchased the land, and the payment to Cessna by the syndicate, and their close associates and relatives, of the amount for the alleged purchase of the mortgage in the name of the Bellaire Securities Corporation was, by reason of the syndicate's personal liability for its payment, in law and in fact the payment of the mortgage. That as Mrs. Davison's husband was a member of the syndicate, and as the mortgage was purchased by the syndicate for the benefit of its members, their "close associates and relatives," her alleged purchase of one-fourth interest was with notice and subject to the personal liability of her husband for the payment of the mortgage, so that the alleged purchase by the syndicate operated as a payment *pro tanto* of her alleged one-fourth interest in the mortgage.

These contentions, and various subsidiary questions, have been argued with ability and thoroughness by counsel for the respective parties, with copious citations of authorities and references to the pages of the rather voluminous evidence; but as we see it, the law of the case is clear and simple and the controlling questions in the case are few in number, and, in the main are questions of fact.

A reading of the evidence in this rather bulky record has left the impression that in this case, as in many others which have reached this Court, as an aftermath of the boom, none of the parties to these transactions were guilty of any in-

tentional fraud or wrongdoing while the negotiations were going on, and if conditions had remained the same and land values had held up to what they were, or were believed to have been, in the fall of 1925, the chances are, none of the parties would have suffered any loss and this controversy would never have arisen. Strange and fantastic as it may seem now, this land was considered to be worth $400,000.00 or more in November, 1925, which was sufficient to afford adequate security to all three of the mortgages which were placed thereon if values had kept up to their then high levels. But the collapse of the 1925 real estate boom, and the terrific shrinkage in values which accompanied and followed it, has naturally caused much litigation, and the raising of many questions which gave the buyers and sellers of real estate in those halcyon days little or no concern at the time. In the clear cold light of "the morning after," the importance of the questions of the priorities of mortgage and other liens, and of personal responsibilities, were accentuated.

In his very interesting and valuable treatise on "The Disregard of Corporate Fiction," several times cited by appellees, Prof. Wormser (pp. 10-11) says:

"A Federal court has recently said, in language peculiarly apt, 'Every question of law arises out of a fact situation, and if there be no state of facts there can be no question of law.' The lawyer has a creed. The judges are the transmitters and interpreters of the creed. The manner in which they accomplish this is through the decision of cases. One may begin the study of legal problems with a search for a general point of view. One ends always with the consideration of cases. If one once understands the facts, the law flows almost inevitably from their mere statement. To state most legal problems fully and fairly is to answer

them in advance. There is far more difficulty in ascertaining the facts than in applying the law. Therefore, I shall have to ask you to bear with me while I discuss cases as well as principles."

This case is illustrative of the truth of this statement. Without attributing any conscious attempt on the part of any of the witnesses to twist their testimony to suit their interests, it must be considered that they were testifying about transactions occurring several years prior to the taking of testimony, which probably accounts for some of the vagueness and discrepancies here and there; and this Court, and no doubt the trial court, has had more difficulty in its efforts to get at the real facts on some of the important points than it has experienced in getting at the applicable law of the case.

If the contested questions rested solely upon the written documents by which this land passed from Cessna to Brown and from Brown to Bayview Corporation, as a result of the sale by Brown to Root, and by Root to Adair, who assigned to the Bayview Company subject to the $63,000.00 first mortgage to Cessna, which the Bayview Company assumed and agreed to pay, and then executed the second mortgage to Brown for $112,590.00, and the third mortgage to Bond for $120,718.00; and the subsequent assignment of the Cessna mortgage to Bellaire Securities Corporation; the decision of this case would be easy. But this is not half the story, nor more than a small fraction of the evidence, which it has been necessary to consider in view of the questions raised.

There is no need to consider the question of disregarding the corporate entity of the Bellaire Securities Corporation. Admittedly, it holds the title to the mortgage sought to be foreclosed for the use and benefit of those persons who fur-

nished the money to buy the mortgage, all but one of whom were members of the Jones-Howe syndicate and stockholders in the Bayview corporation. But there is a serious question here whether, under the evidence, the corporate entity of the Bayview company should be disregarded, and its stockholders who participated in the purchase, held to have been personally bound to pay said first mortgage at the time they bought it from Cessna; and then, if they became so personally bound, whether Brown waived such personal liability and accepted the corporate liability instead.

The first question to be considered is whether or not Jones, Howe, *et als.*, became, by reason of the Adair contract with Root, personally obligated for the payment of the purchase price of the lands in question. If they did so become personally liable, and such liability continued, the law is well settled that the organization of a corporation for the purpose of evading an existing personal liability on the part of those who became its stockholders will not be allowed to achieve that purpose, for in such case the courts' will "pierce the veil of the corporate fiction" and hold the stockholders of the corporation to their personal liability, even though the corporation was regularly organized in accordance with the statutes. Not that the law deems it reprehensible to form a corporation in order to limit one's risk to the amount of his investment in the stock, so far as *future liabilities* of the corporation are concerned; for this is legitimate and an every day occurrence.

Thus Prof. Wormser, in the book referred to (p. 18), says:

"Such a decision is entirely correct, because, if the corporation has been validly organized in its inception, the use of the corporation to prevent the incurring of personal obligations in the future is entirely proper and legitimate.

The policy of our laws today sanctions incorporation with the consequent immunity from individual liability. It follows that no fraud is committed in incorporating for the precise purpose of avoiding and escaping personal responsibility. Indeed, that is exactly why most people incorporate, and those dealing with corporations know, or at least are presumed to know, the law in this regard."

And again, on page 84, the same author says:

"What general rule, if any, can be laid down? The nearest approximation to generalization which the present state of the authorities would warrant is this: When the conception of corporate entity is employed to defraud creditors, to evade an existing obligation, to circumvent a statute, to achieve or perpetuate monopoly, or to protect knavery or crime, the courts will draw aside the web of entity, will regard the corporate company as an association of live, up-and-doing, men and women shareholders, and will do justice between real persons. This is particularly true in courts of equity, but finds many illustrations in courts of law as well, for it must not be thought that "Our Lady of the Common Law" is not sufficiently powerful to explode sophistry or scholastic theory where used as a cloak for wrongdoing."

See also 14 C. J. 59-61; 7 R. C. L. 27; and cases cited; also Biscayne Realty & Ins. Co. v. Ostend Realty Co., 148 So. 560, 109 Fla. 1; Third Ave. Co. v. Keely, 111 Fla. 46, 149 So. 30; Winn & Lovett Grocery Co. v. Saffoul Bros. Produce Co., 121 Fla. 833, 164 So. 681; Mayer v. Eastwood-Smith & Co., 122 Fla. 34, 164 So. 684.

Returning now to the question of whether the Bayview stockholders had incurred personal liability for the payment of the Cessna first mortgage by means of the Root-Adair contract, it might be well to review briefly what led up to

this contract, which was in its nature a contract of both purchase and assignment.

Dr. Charles E. Cessna owned approximately 50,000 acres of land in Bay and Walton Counties, Florida, and on December 18, 1922, contracted with William H. Brown and Sons, a Chicago real estate firm, of which Raymond P. Brown was a member, to give said firm the exclusive right for ten years to sell and to issue contracts for the sale of, or to purchase, any of the lands covered by the contract. The "Bayview Tract" of approximately 8,840 acres, fronting on Choctawhatchee Bay in Walton County, was included in the agreement. On March 31, 1925, this tract was purchased by Raymond P. Brown for $9.50 per acre, a total of about $84,000.00, and he some months later gave Cessna a first mortgage thereon, dated July 1, 1925, for $63,000.00, as part of the purchase price, Cessna having deeded the property to him.

On July 17, 1925, Jesse A. Root, a real estate operator of Erie, Pa., acting for a syndicate composed of Frank S. Bond, F. A. Duncombe and E. E. McGill, all of Erie, Pa., contracted in writing to purchase from Raymond P. Brown the Bayview Tract for $265,335.00. While this contract provided that the purchaser, Root, would assume and agree to pay, as part of the purchase price, a first mortgage to be given on said land by Brown to Cessna, the execution of the $63,000.00 mortgage, dated July 1, 1925, had evidently not been completed at that time, as the acknowledgments of Brown and his wife thereto were not taken until November 2, 1925.

On September 14, 1925, Jesse A. Root executed a written contract, under seal, to sell the said lands to Z. D. Adair, of DeFuniak Springs, Florida, for $398,002.50. This contract acknowledged the receipt of the payment of $10,000.00

and provided for the payment of $89,500.00 to the seller upon conveyance of the property to the buyer, and the giving of a second mortgage by the buyer to the seller for the remainder of the purchase price. It is also provided that all of the terms, conditions and provisions of the contract between Raymond P. Brown and Jesse A. Root, except as to the provision as to price to be paid for the land, "be and the same are hereby adopted and incorporated as part of this agreement." This contract also sold, assigned and transferred to Adair, his heirs, legal representatives and assigns, all the seller's rights under said contract with Raymond P. Brown and wife, and all of the right, title and interest of the seller in and to the land described in and covered by said contract.

It was also provided that the trade between Brown and Root, as outlined in the contract between them, a copy of which was attached, and the trade between Root and Adair should be closed simultaneously and that conveyances should be made, direct from Brown, the present owner of the land, to Adair, in order to avoid having a conveyance first made to Root, the seller, and from him to Adair, the buyer. The contract also contemplated that in fixing the amount of the second mortgage to be given by Adair to Root, there first be deducted the total cash payments, including the binder payment, made by the buyer to the seller, and the amount of the first mortgage, evidently referring to the mortgage given by Brown to Cessna, so that the cash payments, the first mortgage and the second mortgage would cover and settle the purchase price of the property to the seller. We think, therefore, that the effect of the contract, fairly interpreted as a whole, was that Adair assumed and agreed to pay, as part of the purchase price, the first mortgage of $63,000.00, given by Brown to Cessna, although

the execution of that mortgage had not been completed by acknowledgment or delivery at the time this contract was entered into.

Neely Bowen, a real estate broker, of Chicago, influenced Adair to make this purchase and furnished Adair with the $10,000.00, which the latter paid to Root at the time the foregoing contract was entered into. Adair considered that he and Bowen were buying the property, but as a matter of fact, Bowen was acting for a syndicate composed of Frank G. Jones, Burton A. Howe, George W. Davison and Warren H. Snow, of New York City, and Earl C. Eifert, George C. Thomson and I. C. Bradbury, of Grand Rapids, Mich. Bowen, a former resident of Memphis, Tenn., had known Frank G. Jones when he likewise resided in that city. Bowen interested Jones in the purchase of the Bayview Tract and on the morning of September 14, 1925, he got in touch with Jones by long distance telephone and told him that he thought it was a "good buy," and Jones authorized Bowen to put up a binder of $10,000.00 for the purchase of the land and wired him the money which Bowen paid by means of his personal check, which he handed to Adair and Adair handed to Root. It appears that Root then turned the money over to Frank S. Bond, who headed the syndicate which Root had been acting for. No written contract was executed by Frank G. Jones. Nor was any letter or telegram from him to Bowen or to Adair produced or offered in evidence. He had, however, as above stated, by long distance telephone message from Jones in New York to Bowen in Pensacola, authorized Neely Bowen to purchase the Bayview tract and sent the $10,000.00 which he and Adair used in order to get this contract with Root. Neither Root nor Bond knew who Bowen represented.

Bowen testified that Adair called on him at the San Carlos

Hotel in Pensacola about September 1st, and asked him to
find buyers for this land; that he had some correspondence
with Mr. Jones about the property, but not about the con-
tract; that a couple of telegrams were also exchanged be-
tween them, but that his authority to purchase was given
by the telephone message above referred to. Adair did not
know Jones or any of his associates and had no dealings
with anyone but Bowen in connection with the matter, and
testified that he and Bowen were planning to incorporate
and buy the land, and then sell it for a profit. That Bowen
and himself employed an attorney to incorporate, and then
sold the stock to pay for the land. That they had no con-
tract to sell the land at the time they bought it from Root.
But Bowen's testimony makes it plain that he was acting
for Frank G. Jones, and in his second deposition he stated
positively that the contract of purchase taken by Adair from
Root was taken by Adair on behalf of himself and F. G.
Jones. Whether Bowen then knew that Jones had asso-
ciates does not appear; nor does it clearly appear that the
so-called Jones Syndicate, whose names are above given,
had actually been formed at the time Jones authorized
Bowen to buy the property.

Frank G. Jones died before this cause was at issue, but
from the testimony of Bowen and Adair and the other sur-
viving parties to the transaction, it appears that Jones ver-
bally authorized Bowen to purchase the Bayview tract and
sent him money to make the initial or binder payment, and
that Bowen utilized Adair as a figurehead to accomplish the
purpose. So Bowen, by a telephone message from Jones
in New York, became the verbally authorized agent of Jones
to purchase, and Adair, who had no dealings with Jones or
any of his associates and who purchased in his own name
and who signed the contract at Bowen's request, was really

acting as the agent of Bowen, or as he evidently believed, for the benefit of himself and Bowen, just which the testimony does not make clear.

It may also be fairly inferred from the evidence as a whole, that Jones was acting for a syndicate composed of himself and the others hereinabove referred to, though it does not appear just how nor when the syndicate was formed.

It is true that some of the testimony tends to support the theory that Bowen and Adair themselves were attempting to purchase the property by means of the Root-Adair contract (and the use of Jones' money) with the intention of reselling to Jones (whom Bowen had already persuaded to buy and put up $10,000.00 as a binder) at a profit to Bowen and Adair of $25,000.00, and that this profit was recognized and paid in the final settlement, some two months later, when all the trades which had been made with reference to this property were completed and at which time Adair assigned the Root-Bowen contract to Bayview Improvement Company. But, on the whole, we think that Jones and his associates were the real potential purchasers, and that whatever Bowen, at least, and probably Adair also, got out of the final settlement was more in the nature of commissions than profits.

If Neely Bowen, who was verbally authorized by Jones to buy the property (though on just what terms is not shown) had himself bought the property and signed the written contract of purchase from Root, then it may be that Jones and his joint adventurers, referred to as the Jones or New York syndicate, would have been legally obligated to carry out the contract and pay the purchase money, including the first mortgage to Cessna.

The language of our statute of frauds (See 5779, Comp.

Gen. Laws) is that "No action shall be brought whereby to charge * * * any person * * * upon any contract for the sale of lands, * * * or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof, shall be in writing and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized." To comply with the statute, the written memorandum for the sale of land must designate the lands, disclose the terms of sale (Swisher v. Conrad, 76 Fla. 644, 80 So. 564) and the other contracting party, so that he can be identified without parol proof (Knowles v. Albert, 9 Fed. 2nd, 163, 165) ; but it may be executed by an agent whose authority is created *by parol*. See Smith v. Shackleford, 92 Fla. 731, 110 So. 358, and cases cited. But to hold that an agent so authorized by parol to execute a written contract for the sale or purchase of land for his principal can delegate such authority to another (at least without the principal's express authority to that effect) would be going too far and would tend to defeat the purpose of the statute. See in this connection 27 C. J. 295-297, 2 C. J. 685-686.

Under the law applicable to agency in general, the unauthorized appointment of a sub-agent may be ratified by the principal, but the mere fact that the principal later learned of the employment of such sub-agent and acquiesced therein is not a ratification, if there is nothing to show that he understood that the sub-agent was employed as his agent, and not as the agent of the primary agent. 2 C. J. 687-688.

According to the strict common law rule, in order to bind a principal by a contract under seal, as this one was, the

instrument must profess to bind the principal, and it must be executed in his name and as his deed or contract. If it purports to be executed as the instrument of the agent and under his individual signature and seal, it is not binding on the undisclosed principal even though the other party to the instrument actually knows the principal and that the agent is contracting for him. 2 C. J. 676. And the rule is a familiar one that the authority of an agent cannot be established merely by proof of his own declarations made to a third party, in the absence of the principal.

Our conclusion on this point is that the record does not show that Adair had authority to bind Frank G. Jones, or his associates, on this $398,000.00 land contract. Nor does it clearly appear that even Neely Bowen had authority to incur, on behalf of Jones, all the obligations which were embraced in the Root-Adair contract. It follows, of course, that neither Jones nor his associates were legally obligated by means of the execution of the Root-Adair contract to take or pay for the land, or to assume and pay the Cessna mortgage.

But it is further contended by appellees that this lack of authority to bind Jones, *et al.,* at the time was supplied or cured by the fact that Jones and his associates later accepted and enjoyed, with full knowledge, all the fruits of the Adair contract, and thus ratified all the acts which had been done by Adair and Bowen, including the making of the Root-Adair contract, and thereby became personally obligated to pay the Cessna first mortgage.

After the execution of the Root-Adair contract on September 14, 1925, there was a delay of some two months while the abstracts were being prepared and the title to the Bayview tract was being investigated and some kinks in it straightened out. Shortly thereafter the several contracts

involving this land were all closed in the office of William Fisher, Esq., in Pensacola, on November 17th, 1925, who had investigated the title for the interested parties.

About a week or ten days before November 17th, Neely Bowen had a conversation with Frank G. Jones in Memphis, which probably shows the genesis of the incorporation idea, and also tends to negative the theory that Bowen was a joint adventurer with Jones. It also indicates that Bowen did not consider that Jones was at that time bound by any contract to purchase the land. In that conversation, Bowen told Jones that "if the Florida boom continued, it was a good buy, but if the boom was collapsing, the land was not worth buying," and that Jones "would be better off to forfeit the binder of $10,000.00 already put up," as in Bowen's opinion "the land was not worth more than $5.00 per acre under ordinary conditions." But Jones said he thought that the activity would continue for two years more at least, and told Bowen to "go ahead and close the deal." This we think amounted to a ratification of Adair's agency in making the contract, when considered in connection with what subsequently happened, for the natural presumption is that Bowen told Jones all about the Adair contract. Jones then instructed Bowen to return to Florida and organize a corporation to take title to the property.

This was promptly done. The corporation was organized on November 12, 1925, and incorporated, at the expense of Bowen and Adair, as the Bay View Improvement Company, with $15,000.00 capital stock, Neely Bowen, Z. D. Adair and his brother, J. E. Adair, being the incorporators and each taking fifty shares of the stock. Nothing was paid for the stock at the time, which, together with the small capitalization of $15,000.00, appellees argue in support of their charge that the corporation was a mere sham. The claim of

appellants is that the stock was paid for by the transactions which took place a few days later, when the trades were closed, by means of which the corporation got the land, and the money necessary to make the cash payments. That the corporation was legally formed in accordance with the Florida corporation law is not denied. The court below was asked to disregard the corporate entity on other grounds.

Bowen testified that several days before the closing of the deal he had a conversation with Mr. Wm. H. Brown, father and partner of Raymond P. Brown, and who represented his son in the windup meeting, and told him that he had just returned from Tallahassee with a charter for the Bay View Improvement Company; that Mr. Brown demurred a little to the fact that a corporation was taking title, whereupon Bowen pointed out to him that the contract called for a deed direct to Z. D. Adair or his assignee, and Brown subsequently carried through the transaction whereby the corporation took title without further responsibility.

On November 12, 1925, Frank G. Jones wired the American National Bank of Pensacola as follows:

"Have Just Wired the Central Union Trust Company of New York as Follows Please Place to Credit of American National Bank Pensacola Florida One Hundred and Twenty Thousand Five Hundred Dollars to Be Paid Out on Instructions of Neely Bowen on Delivery to That Bank of Deed for Eighty Eight Forty Four and Fraction Acres Bay View Tract Land Deed to Bay View Improvement Company Together With All Stock of Said Company Properly Endorsed Stock to Be Sent You Deed to Be Sent for Record

WITH INSTRUCTIONS TO BE RETURNED TO YOU AFTER RE-
CORDING."

The money reached the Pensacola Bank through the Fed-
eral Reserve Bank in Atlanta, which repeated the instruc-
tions contained in Jones' above telegram.

At the closing meeting in Attorney Fisher's office on No-
vember 17, 1925, Z. D. Adair and Frank S. Bond executed
an assignment under seal to the Bay View Improvement
Company of the contract between Root and Adair and the
contract between Brown and Root, in which assignment
Raymond P. Brown was requested and authorized to make
a conveyance of the Bay View Tract to Bay View Improve-
ment Company.  Mr. Wm. H. Brown, who represented his
son and partner, Raymond P. Brown, in the matter, had
with him a deed which had been executed by Raymond P.
Brown and wife, the name of the grantee left blank, and
during the course of the meeting the name of the Bay View
Improvement Company was filled in as the grantee and the
deed delivered.  This deed stated that it was given subject
to the Cessna mortgage which "the grantee herein hereby
assumes and agrees to pay as a part of the purchase price."

It appeared that Adair owed Root and Bond as a total
cash payment the sum of $98,769.50, and that Root and
Bond owed Brown $87,795.00.  The American National
Bank turned the money, $121,500.00, over to Bowen, who
delivered all of the stock of the Bay View Improvement
Company, assigned in blank, to the bank.  Bowen then used
this $121,500.00 to pay the balance of the cash payment on
the purchase price of the land under the Root-Adair con-
tract, which was paid to Frank S. Bond, for whom Root
had acted.  Bond then used this money to pay Brown the
cash payment to him under the Brown-Root contract, which
was $87,795.00 as above stated.  Brown paid Cessna the

difference between the amount of the first mortgage which he had given Cessna, $63,000.00, and the purchase price of about $85,000.00 under his contract of purchase from Cessna. The deeds and mortgages were then passed. The Bay View Improvement Company gave Brown a second mortgage for $112,590.00, which stated that it was subject to the Cessna mortgage and was given to secure the payment of a part of the purchase price, and the corporation also gave Frank S. Bond, a third mortgage for $120,718.00, representing the balance due on the Root-Adair contract.

Neely Bowen testified that this $121,500.00 was placed in his personal account with the American National Bank as Neely Bowen, Trustee, and that the money was sent to him to buy the land and did not go into the Improvement Company, but went to Wm. H. Brown, Frank S. Bond and Z. D. Adair; that he disbursed $98,000.00 as the cash payment necessary for the purchase of the property, and that the remainder was paid out as commissions to three or four different ones; that Adair got the principal amount and that he, Bowen, got $7,000.00 of it, and twenty shares of the Bayview stock. As to the $98,000.00 payment for the purchase of the land, he also testified that he paid that amount as President of the Bay View Improvement Company and for that Company. He also testified that at the time there was still great activity in the real estate market in the section where this tract was situated and the value of the tract was regarded as being in the neighborhood of $400,000.00. He was asked this question: "Is it not a fact that Wm. H. Brown expressed the opinion that the value of the property included in the mortgages was sufficient to protect the Cessna first mortgage and the Brown second mortgage?" And he answered, "Yes, that was said."

In the testimony of Frank S. Bond, who was present at

the meeting, he was asked this question: "State whether you remember any conversation by Dr. Cessna in which Wm. H. Brown, at the time of such final closing, stated his willingness to accept the corporate responsibility of Bay View Improvement Company in lieu of all personal and individual responsibility." And he answered, "I do remember such a conversation."

Mr. Wm. Fisher, in whose office the settlement was had, testified that Dr. Charles E. Cessna, who was present, made the first mention during the conference of the fact that Bay View Improvement Company was a corporation and was securing the mortgage, to Brown and the mortgage notes, and asked Mr. Brown if he, Brown, was willing to accept the corporate obligation of Bay View Improvement Company, or whether he wanted some personal responsibility behind the paper. Mr. Brown made no definite answer, but Bowen made the statement that if Mr. Brown wanted any personal responsibility in connection with the paper, he would have to get it from Bond and Root, for the reason that they were the persons with whom he, Brown, had his contract; that he had no contract with anyone else; and that the only way in which the trade could or would be closed, would be for the property to be deeded to the Bay View Improvement Company, and for the people who were to take mortgages to take the notes and mortgages of the Bay View Improvement Company, since the people who were furnishing the money would in no event furnish or offer any personal responsibility. That Mr. Brown then made the statement that he was willing to accept the corporate obligation of Bay View Improvement Company; that he regarded the value of the land as being ample to protect the second mortgage he was getting, and that he would not require any personal responsibility in connection with the

paper. After that the trade was closed on·that basis, and the money obtained by the delivery of the stock to the American National Bank, together with the deeds showing that the corporation had acquired title to the property.

It seems that Mr. Fisher had represented Frank G. Jones and his associates, and Root and Bond in examining the titles and drawing and passing on the several instruments involved in the transaction. Appellees contend that all the transactions prior to a few days before the closing dealt only with the purchase of the land and had nothing to do with a corporation taking title to the land; that in a letter to Brown of September 30, 1925, relating to the abstracts of title, Mr. Fisher wrote: "The parties purchasing the property are going ahead with their trade and would like to have arrangements made as soon as possible to clear up the objections, etc." It also appears that soon after the Root-Adair contract was executed in which Jones's $10,000.00 binder was used by Adair in making a cash payment to Root, Bowen wired Jones that he had an offer of $40,000.00 "for the Contract," but Jones refused to accept it.

We think that the foregoing, taken together with the whole record, indicates that Jones and his associates, while they did not, at the time of its execution, become legally bound by the Root-Adair contract to purchase the land, they subsequently ratified its execution by Bowen's sub-agent, Adair, and were, in the eys of equity, the real purchasers; but, inasmuch as the property was deemed to be worth more than the proposed mortgages, they were in a position where they could lawfully form a corporation to take the deed to the property and execute the mortgages for the balance due on the purchase price, without personal responsibility on their part, provided this was consented to by the interested parties. And this was exactly what happened. The evi-

dence is convincing that all the parties to the transaction, including Dr. Cessna, and certainly Mr. Brown, understood and acquiesced in this arrangement, and accepted the corporate liability in lieu of the individual liability, and thereby precluded themselves from later claiming to the contrary. It is perfectly plain that it was on this basis and understanding that Bowen, acting for Jones and his associates, paid over the $121,500.00 which made it possible for Brown to settle with Cessna, and for Root and Bond to settle with Brown, and for the corporation to settle with Adair and pay the accumulated commissions on down the line. In these circumstances, we think it would be highly inequitable to hold that the corporate entity should be disregarded, and that, in spite of this waiver of personal responsibility, Jones and his associates should be held to have been personally obligated, after the transaction was concluded in this fashion, to pay either the Cessna first mortgage, or the other mortgages which were executed by the Bay View Improvement Company, which together with the $121,500.00 and the $10,000.00 binder made a total purchase price to the corporation of about $450,000.00.

A party may waive any right to which he is legally entitled, whether secured by contract, conferred by statute, or guaranteed by the Constitution. See 27 R. C. L. 904, *et seq.;* Rader v. Prather, 100 Fla. 591, 130 So. 15, 17; Nelson v. Dwiggins, 111 Fla. 298, 149 So. 613. This is not in conflict with the rule that the terms of a sealed contract cannot be changed by parol. Becker v. Becker (Ill.) 95 N. E. 70; Martin v. Martin (Vt.) 55 A. L. R. 697.

After the trades were closed the certificates of stock, endorsed in blank, were delivered to Burton A. Howe in New York, who held the stock, except 20 shares given to Neely Bowen for his commission, in trust for the several mem-

bers of the Jones syndicate in proportion as each member had contributed in cash to the fund of $121,500.00 which Jones had sent to the American National Bank to be paid out when the deed to the corporation and the stock were delivered to the Bank, plus the $10,000.00 put up by Jones as a binder back in September, making a total of $131,-500.00 contributed in cash by the members of the syndicate. This resulted in the stock ownership of Bayview Improvement Company being as follows: Frank G. Jones, 25% of 130 shares, 32½ shares; Burton A. Howe, 25%, 32½ shares; George W. Davison, 25%, 32½ shares; Warren H. Snow, 12½%, 16¼ shares; I. C. Bradbury, Earl C. Eifert and George C. Thomson, 4 1/6 per cent. of 130 shares, or 5 5/12 shares each; and Neely Bowen, 20 shares (given him as commission); total, 150 shares. None of these parties, except Neely Bowen, was ever an officer or director of the corporation.

When the semi-annual interest fell due on the Cessna first mortgage in May, 1926, the corporation was unable to pay it. The corporation had no money. By means of turpentine leases and an oil lease, Neely Bowen, President of the corporation, had manged to pay its taxes. The boom was over. The first mortgage was in default. Then Burton A. Howe, acting on his own responsibility and, as he testified, to prevent foreclosure and to maintain the *status quo* for the benefit of all concerned, in the hope that the company would later be able to protect it and its other obligations, purchased the first mortgage from Cessna for $63,630.00. The mortgage was assigned blank. The name of Bellaire Securities Corporation all the capital stock of which was owned by Howe, was later inserted as assignee.

Howe, after buying the mortgage, invited the other stockholders, whose stock he held in trust, to purchase an in-

terest in the mortgage. He said he felt obligated to do this. All the stockholders, who were also former members of the Jones syndicate, accepted and purchased interests in the mortgage, in the same proportion in which they held stock in the Bayview Corporation, with the exception of George W. Davison, whose wife, Mrs. H. B. Davison, purchased, with funds derived from the sale of some of her own securities, the 25% interest in the mortgage which had been offered to her husband, paying $15,925.00 for it. Thus some three years later, when it was decided to foreclose the mortgage, Warren H. Snow having meanwhile disposed of his stock in the Bayview Company to Atlantic Securities Corporation, the Bellaire Securities Corporation held the first mortgage in trust for the beneficial owners who had participated in its purchase, and who together owned a major portion, or about 55%, of the stock in the Bayview Improvement Company. Mrs. Davison, who never owned any of the Bayview stock, who was no longer a stockholder, held a 12½% interest in the mortgage. Neely Bowen, who owned 20 shares of the Bayview stock, not having been a member of the Jones syndicate, was not asked to and did not participate in the mortgage purchase.

If these parties, or any of them, who participated in the purchase of the first mortgage, had been at the time personally liable for its payment, then such purchase would have operated, *pro tanto,* as a payment of the first mortgage as against Brown, the second mortgagee. It is not necessary to cite authorities in support of that legal principle. But, as we have seen, they were not personally bound to pay said mortgage, such personal liability having been waived. Appellees claim, however, that such purchase nevertheless operates as a payment of the mortgage because of the stockholding relationship of the purchasing parties to

the Bayview corporation, which held the title to the land and whose duty to pay the mortgage is not denied; that under the circumstances it would be inequitable to hold that all, or a controlling majority, of the Bayview Company's stockholders could accomplish what the corporation itself could not do, and that a court of equity will pierce the corporate entity and hold the stockholders liable, when, to do otherwise, would lead to an inequitable result. We agree to this last proposition of law, but we are not so sure about its assumed factual premise. Is it true that a stockholder, or a majority of them, acting as individuals, cannot acquire any rights which the corporation could not acquire? We cannot concede that.

Ordinarily, there is no question about the right of a stockholder, or director, in the absence of fraud, to acquire, hold and enforce, against the corporation, the notes, bonds, mortgages, or other obligations, of the corporation. See Martin v. Chambers, 214 Fed. 769; Munro v. Smith, 243 Fed. 654; Gallogly v. Stender (R. I) 154 Atl. 280; Briggs & Co. v. Harper Clay Products Co. (Wash.) 272 Pac. 962; Herrill v. Normandie Corporation (Cal.) 294 Pac. 774; Caldwell v. Robinson (N. C.) 103 S. E. 75; La Veine v. Tiffany Springs Co. (Mo.) 187 S. W. 1186; 14 C. J. 868; 14-A C. J. 134-136. In Caldwell v. Robinson, *supra,* it was held that where the directors of a corporation paid a debt of the corporation secured by a mortgage on its property, they were subrogated to the right of the creditor to the security. And in Martin v. Chambers, *supra,* the opinion in which was written by District Judge Call, sitting as a member of the Circuit Court of Appeals for the Fifth Circuit, it was held that the purchase by an officer of an insolvent corporation, at full value, of notes of the company, which were a lien upon its property, for the purpose of con-

serving the property, it appearing that but for such purchase the lien would have been foreclosed, is not a fraud upon the other creditors or junior lienors, and raises no equity in their favor which prevents the purchaser from enforcing the lien.

But appellees insist that this case falls within the operative effect of the principle laid down in Home Fire Ins. Co. v. Barber, 67 Neb. 644, the opinion in which was written by Dean Roscoe Pound, then a Commissioner of the Supreme Court of Nebraska, wherein it was said that, "When the corporation comes into equity and seeks equitable relief, we ought to look at the substance of the proceeding, and if the beneficiaries of the judgment sought have no standing in equity to recover, we ought not to become befogged by the fiction of corporate individuality, and apply the principles of equity to reach an inequitable result."

Now the corporation that filed this suit—the Bellaire Securities Corporation—to foreclose this first mortgage, is undoubtedly acting for the benefit of those who purchased the mortgage, who are the real parties in interest, and if they have no standing in equity to recover as against these appellees then the learned chancellor was correct in rendering the decree appealed from. But if, as we have above held, these mortgage purchasers were not personally liable for the payment of this mortgage, the mere fact that they were the holders of most of the stock in the Bay View Improvement Company, which company *was* liable, did not under the above authorities render them individually liable for its payment, either at law or in equity. Therefore, their purchase of the mortgage did not operate as a payment of it, and it cannot be said that the persons in whose behalf and for whose benefit the Bellaire corporation filed this suit to foreclose were without standing in equity to recover.

Especially is this true as to Mrs. H. B. Davison,. who was not a stockholder.

For these reasons the decree appealed from must be reversed and the cause remanded for appropriate proceedings consistent with the principles herein expressed.

Reversed and remanded.

WHITFIELD, C. J., and TERRELL and DAVIS, J. J., concur.

ELLIS, P. J., and BUFORD, J., concur in the conclusion.

### ON REHEARING.

PER CURIAM.—The opinion and judgment of reversal heretofore rendered in the above entitled cause is adhered to and confirmed on rehearing.

WHITFIELD, C. J., and ELLIS, TERRELL, BROWN and DAVIS, J. J., concur.

BUFORD, J. (receding from original opinion).—This case is before us for consideration after reargument granted pursuant to the opinion and judgment filed herein on February 20, 1936. The question which it now appears necessary for us to determine is whether or not Bellaire Securities Corporation named as the assignee of a mortgage executed by Raymond P. Brown, *et al.*, to Charles F. Cessna on July 1, 1925, in the sum of $63,000.00 under the facts and conditions set forth in the original opinion filed herein as above stated, may foreclose such mortgage against Raymond P. Brown and his wife, Pearletta Brown.

The decree of the Circuit Court from which this appeal was taken amongst other things adjudicated:

"That, as against the said Raymond P. Brown and William H. Brown, the mortgage on the premises hereinafter particularly described executed the first day of July, 1925, by the said Raymond P. Brown and Pearletta Brown, his

wife, to Charles E. Cessna, recorded in Mortgage Book 21, pages 441 to 446, of the public records of said Walton County, and the indebtedness secured thereby, have been paid, and the said mortgage is hereby cancelled, and the Clerk of this Court is hereby directed to make entry upon the margin of the said record of said mortgage that the said mortgage has been cancelled by this decree with appropriate reference to this decree and its date and place of record."

This adjudication was necessarily based upon the finding that the money paid to Cessna by Howe as set forth in the original opinion herein constituted a payment of the mortgage upon the theory that Howe and his associates had become primarily liable for the payment of that obligation and the transaction did not constitute a purchase and an assignment. In the original opinion Mr. Justice BROWN, speaking for the Court, said:

"There is no need to consider the question of disregarding the corporate entity of the Bellaire Securities Corporation. Admittedly, it holds the title to the mortgage sought to be foreclosed for the use and benefit of those persons who furnished the money to buy the mortgage, all but one of whom were members of the Jones-Howe syndicate and stockholders in the Bayview Corporation. But there is a serious question here whether, under the evidence, the corporate entity of the Bayview company should be disregarded, and its stockholders who participated in the purchase held to have been personally bound to pay said first mortgage at the time they bought it from Cessna; and then, if they became so personally bound, whether Brown waived such personal liability and accepted the corporate liability instead.

"The first question to be considered is whether or not Jones, Howe, *et als.,* became, by reason of the Adair con-

tract with Root, personally obligated for the payment of the purchase price of the lands in question. If they did so become personally liable, and such liability continues, the law is well settled that the organization of a corporation for the purpose of evading an existing personal liability on the part of those who became its stockholders' will not be allowed to achieve that purpose, for in such case the courts will 'pierce the veil of the corporate fiction' and hold the stockholders of the corporation to their personal liability, even though the corporation was regularly organized in accordance with the statutes. Not that the law deems it reprehensible to form a corporation in order to limit one's risk to the amount of his investment in the stock, so far as *future liabilities* of the corporation are concerned; for this is legitimate and an every day occurrence."

Then further in the opinion, in reviewing the action of the stockholders in Bayview Improvement Company, it is said:

"We think that the foregoing, taken together with the whole record, indicates that Jones and his associates, while they did not, at the time of its execution, become legally bound by the Root-Adair contract to purchase the land, they subsequently ratified its execution by Bowen's subagent, Adair, and were, in the eyes of equity, the real purchasers; but, inasmuch as the property was deemed to be worth more than the proposed mortgages, they were in a position where they could lawfully form a corporation to take the deed to the property and execute the mortgages for the balance due on the purchase price, without personal responsibility on their part, provided this was' consented to by the interested parties."

The opinion then says, "and this was exactly what happened." As we now see the record, that statement was not

warranted because Cessna at no time agreed to waive the personal liability of those men whom the original opinion holds had become legally bound by the Root-Adair contract "and were, in the eyes of equity, the real purchasers."

Brown was not in position to waive the liability on behalf of Cessna, though we assume that Brown waived the liability of the individuals who had organized the corporation to take title to the property insofar as there was any liability to pay his second mortgage, or, in other words, the mortgage which was to be executed by the vendee corporation to Brown, the vendor, who was the vendee of Cessna.

And so it is, assuming that the adjudication of the Chancellor that the moneys paid by Howe to Cessna constituted a payment of the mortgage and not a purchase, although the mortgage was delivered by Cessna to Howe with a blank assignment which Howe afterwards filled in so as to make the assignment appear to be to Bellaire Securities Corporation, a corporation all of the capital stock of which was held by Howe, and although Howe raised the money evidently to reimburse himself for what he had paid Cessna (because the record shows that Howe procured the funds from his associates who were stockholders in Bayview Improvement Company, and one other person who was the wife of a stockholder in that company) after he had procured possession of the mortgage from Cessna, was a correct adjudication. And further assuming that the statement made in our opinion above referred to—"There is no need to consider the question of disregarding the corporate entity of the Bellaire Securities Corporation. Admittedly, it holds the title to the mortgage sought to be foreclosed for the use and benefit of those persons who furnished the money to buy the mortgage, all but one of whom were mem-

bers of the Jones-Howe syndicate and stockholders in the Bayview corporation," and the further statement in that opinion as follows: "We think that the foregoing, taken together with the whole record, indicates that Jones and his associates, while they did not, at the time of its execution, become legally bound by the Root-Adair contract to purchase the land, they subsequently ratified its execution by Bowen's sub-agent, Adair, and were, in the eyes of equity, the real purchasers"—to be correct. It must then necessarily follow that Howe acquired no title as assignee to the mortgage executed by Brown and wife to Cessna and he, having acquired no title, could not create title by filling in a blank assignment so as to make a corporation of which he was sole owner appear to be the assignee of the mortgage which in law he was obligated to pay, and which had been paid by him.

But whether the gentlemen who organized Bayview Improvement Company, a corporation, were personally obligated to pay this first mortgage or not, they had personally negotiated the agreement on behalf of that corporation whereby that corporation as a part of the purchase price of the land involved assumed and agreed to pay the notes secured by the mortgage from Brown and wife to Cessna and by such agreement they in effect, acting in the name of the corporation, Bayview Improvement Company, agreed to hold Brown harmless on his $63,000.00 obligation to Cessna. Having entered into that agreement with Brown and Cessna they could not in equity and good conscience thereafter so contrive to have that obligation paid to Cessna in such a manner as to leave in them the power to destroy the entire value of the second mortgage made and executed by their corporation to Brown.

We must bear in mind that the record shows conclusively

that Bayview Improvement Company did not pay any of the purchase price for the land. The record shows that the stockholders made such payments as were made direct to Brown. In this regard, Mr. Neely Bowen, who handled the transaction for the parties, testified as follows:

"Is it not a fact that Brown sold the Bayview tract to Jesse A. Root in July, 1925, for $263,385.00 and that in September, 1925, Root sold the property to Adair, the assignor of the Bayview Improvement Company, for $395,000.00?

"A. The amount called for in the contract between Brown and Root was $263,385.00 and the amount to be paid by Adair was Three Hundred and Ninety-five Thousand Dollars, approximately that.

"Has Bayview Improvement Company ever paid any money to any person on account of the mortgage involved in this cause?

"A. It has not.

"Mr. Dever: Wait a minute, are you sure that is the right answer?

"The Witness: Yes, sir. I am still President of the Bayview Improvement Company. We never had a penny since.

"Did you ever see a letter from Cessna to Wm. H. Brown and Sons purporting to be dated May 7th, 1926, with reference to an extension of the interest payment due on the Sixty-three Thousand Dollar mortgage May 10th, 1926? If so, do you know where the original letter is? Do you know whether that letter was dated back at Brown's request, and was in fact written after Wm. H. Brown knew that Cessna had sold the mortgage?

"A. I have seen the letter or a copy of the letter, but I

don't know where the letter is now. I know nothing other than what Dr. Cessna told me it was.

"Is it not a fact that $100,000.00 or more in cash was paid into Bayview Improvement Company for its capital stock?

"A.   There was deposited $121,500.00 to my account in the American National Bank with which to handle the Bayview Improvement Company deal, made the initial payment and pay the commissions involved.   This money remained in my personal account as 'Neely Bowen, Trustee,' and was so disbursed, approximately Ninety-eight Thousand dollars of it being paid as down payment for the land which was deeded to the Bayview Improvement Company, and the remainder of it paid as commissions to three or four different ones.   I do not know whose money it was.   It was sent to me to buy this property.   It was not done as a corporate transaction.   The money did not go into the Improvement Company, but went to Wm. H. Brown, Frank S. Bond and Z. D. Adair.   That is what went with the money and Adair was one who got the principal amount.   I got Seven Thousand Dollars of it."

Now we find from the record that when the mortgage from Brown to Cessna was acquired by Howe he paid the money and took an assignment instead of a receipt.   In Summer v. Osborne, *et al.,* 101 Fla. 742, 135 Sou. 513, we said:

"If money paid to the owner of a first mortgage is advanced by one whose duty it is, by contract or otherwise, to pay and cancel the first mortgage and also a second mortgage, and relieve the mortgaged premises of the lien of the first mortgage, a duty in the proper performance of which the second mortgagee has an interest, the payment thereof shall be held, as to the maker of the first mortgage and as to the second mortgagee, to be a release and not an assign-

ment although an instrument in form purporting to be an assignment is given to the one so advancing the money."

In Home Fire Insurance Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 Am. St. Rep. 716 and 758, the rule applicable here was stated as follows:

"To permit persons to recover through the medium of a court of equity that to which they are not entitled simply because the nominal recovery is by a distinct person through whom they receive the whole actual and substantial benefit, and that nominal person would, in ordinary cases, as representing beneficiaries having a right to recover, be entitled to relief, is a perversion of equity. It turns principles meant to do justice into rules to be administered strictly without regard to the result. It is contrary to the very genius of equity. When the corporation comes into equity and seeks equitable relief, we ought to look at the substance of the proceeding and if the beneficiaries of the judgment sought have no standing in equity to recover, we ought not to become befogged by the fiction of corporate individuality, and apply the principles of equity to reach an inequitable result.

"Hence, we think the rule to apply to such cases is this: Where a corporation is proceeding at law, or where it is asserting a title to property, or the title to property is involved, the corporation is regarded as a person separate and distinct from its stockholders, or any or all of them. But where it is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery, and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be

enforced by the corporation in their behalf and for their advantage, the corporation will not be permitted to recover."

See also Ayer & Lord Tire Co. v. Commonwealth, 208 Ky. 606, 271 S. W. 693; Arkansas, etc., v. Farmers Loan, etc., 13 Colo. 587, 22 Pac. 954; State Trust & Savings Bank v. Hermosa Land and Cattle Co., 30 N. M. 566, 240 Pac. 469.

So, I think the decree appealed from should be affirmed.