167 So.2d 588 (1964)
B.H. SIRMONS, Appellant,
v.
ARNOLD LUMBER COMPANY, a corporation, Appellee.
No. 4106.
District Court of Appeal of Florida. Second District.
May 27, 1964.
Rehearing Denied October 9, 1964.
*589 Linney & McNevin, St. Petersburg, for appellant.
Askew & Beckett, St. Petersburg, for appellee.
BARNS, PAUL D., Associate Judge.
An execution on a judgment in favor of Arnold Lumber Company, the appellee, against Sirmons Supply Company, Inc., having been returned nulla bona, "Arnold" instituted supplemental proceedings against B.H. Sirmons, the president of the "Supply Company," as a consequence of which the court held that the execution could be satisfied out of the personal assets of B.H. Sirmons, whereupon Sirmons appealed. We find error and reverse.
The lower court judge's findings of fact were that B.H. Sirmons in effectuating his various and diverse business promotions employed the policy of operating through a variety of corporations that Sirmons Supply Company, the debtor corporation, was set up and designed to carry out the purposes of Sirmons and was the alter ego of Sirmons and managed to redound to his best interest.
The debtor corporation was organized in 1955 and Sirmons owns 98 per cent of the stock. The corporation owes Sirmons over $147,000 secured by a mortgage or mortgages for money advanced by him. It is not shown that the dealings of the corporation were not entirely corporate. Neither is it shown that the creditor corporation dealt in anywise with Sirmons or relied on any representations made by him. There is no evidence tending to show that the creditor corporation has been victimized by fraud, or any transactions between Sirmons and the Sirmons Supply Company that were in bad faith or that the corporation was the alter ego of Sirmons, as in the case of Biscayne Realty & Ins. Co. v. Ostend Realty Co., 109 Fla. 1, 148 So. 560, and Third Ave Co. v. Keely, 111 Fla. 46, 149 So. 30.
As to piercing the veil of the corporate entity to reach a one-man stockholder, Wormser in his Disregard of the Corporate Fiction, p. 79, 81, 83 states:
"It is true that courts will be more apt to pierce the veil of corporate entity where one person owns all the corporate stock, but they do this in such cases not because it is a one-man company, not because there is but one shareholder, but because the other circumstances of the case make such action imperative. The writer submits that in practically every case of a one-man corporation where the veil of entity was brushed aside, the same result would have followed had there been a thousand stockholders, or ten thousand. * * * The writer, although a firm believer in the necessity for a frequent and liberal disregard of the concept of corporate entity, believes that to ignore it simply because the number of stockholders has become very few, or even one, is to convert an otherwise sane, safe and sensible policy into a reductio ad absurdum; and so, to their credit, the majority of American courts have universally held. * * *
"To reduce this proposition to the form of a rule: corporate entity will not be ignored at law or equity simply because the number of stockholders is few, or even one, unless the circumstances are such as would warrant the same disregard of the entity were there ten thousand shareholders. * * *"
The corporate veil will not be pierced when it is not shown that the corporation was used to mislead creditors or for fraudulent purposes; without more, the mere fact that one or more individuals control the corporate activities is not sufficient *590 to justify imposition of the corporate debt upon the shareholders of the corporation. Riley v. Fatt, Fla., 42 So.2d 769, Gross v. Cohen, Fla., 80 So.2d 360, Advertects, Inc. v. Sawyer Industries, Inc., 84 So.2d 21.
The judgment appealed is reversed without prejudice to further like proceedings.
ALLEN, Acting C.J., concurs and WHITE, J., concurs specially.
WHITE, Judge (concurring specially).
This strikes me as a close case involving an established doctrine which can become increasingly prominent in attempts to enforce business obligations. Because of the need for clarifying evidence as to the time of certain events, I concur in the judgment of reversal which permits the issue of appellant's liability to be explored further upon remand to the trial court. In this context I venture the following opinion.
Following a nulla bona return of execution on a judgment in favor of Arnold Construction Company against Sirmons Supply Company, Inc., the judgment creditor instituted supplemental proceedings against B.H. Sirmons individually. This appeal is by B.H. Sirmons individually from an order applying the alter ego doctrine and adjudging B.H. Sirmons personally liable for the judgment debt of the said Sirmons corporation. The appealed order reads:
"The Court further finds that in effectuating his business promotions that Mr. Sirmons employed the technique of operating through a variety of corporations. The Court finds that these corporations in every case were either directly or indirectly created and brought into being through the efforts of B.H. SIRMONS, and that he acquired a veritable stable of corporations, that each of these corporations was set-up and designed to carry out the purposes of the said B.H. SIRMONS, and for all intents and purposes were the creature and alter ego of B.H. SIRMONS and were conducted and operated by him in a manner calculated to redound to the best interest of B.H. SIRMONS, individually.
"It is the finding of the Court, therefore, that the various corporations including the Defendant corporation of SIRMONS SUPPLY COMPANY, INC., owned, operated and controlled substantially by a respondent, B.H. SIRMONS, individually, constituted the alter ego of the said B.H. SIRMONS, and that under the case Law of the Courts of this State, as understood and construed by this Court, the Plaintiff is entitled to proceed directly against B.H. SIRMONS, individually, to satisfy its Judgment obtained from SIRMONS SUPPLY COMPANY, INC., it is therefore;
"ORDERED AND ADJUDGED that B.H. SIRMONS, individually, is liable for the Judgment of the Plaintiff obtained against SIRMONS SUPPLY COMPANY, INC., in this cause and Plaintiff may levy against the goods, chattels, lands and tenements owned by the said B.H. SIRMONS to satisfy Plaintiff's Judgment."
No question of jurisdiction is raised but it may be noted that the Civil and Criminal Court of Record, although a court of law, had jurisdiction to administer the equitable doctrine involved:
"`When the conception of corporate entity is employed to defraud creditors, to evade an existing obligation, to circumvent a statute, * * * the courts will draw aside the web of entity, * * * and will do justice between real persons. This is particularly true in courts of equity, but finds many illustrations in courts of law as well, for it must not be thought that "Our Lady of the Common Law," is not sufficiently powerful to explode sophistry or scholastic theory where used as a cloak for wrongdoing.'" (Emphasis theirs.) Barnes v. Liebig, 1941, 146 Fla. 219, 1 So.2d 247, quoting from Bellaire *591 Securities Corp. v. Brown, 124 Fla. 47, 84, 168 So. 625, which quoted from Wormser's treatise on "Disregard of the Corporate Fiction."
cf. Robert's Fish Farm v. Spencer, Fla. 1963, 153 So.2d 718, 720.
The appellant acknowledges ownership of the corporation but submits that the record demonstrates no more than simple insolvency deriving from a recession which generally affected the type of business in which the corporation was engaged. He contends that it was error to go behind the corporate form since no fraudulent or misleading conduct was established. It is true that a stockholder's sole[1] ownership and control of a corporation does not of itself warrant application of the alter ego doctrine so as to subject the stockholder to personal liability for the corporate indebtedness, but if the corporation is merely a conduit for the transaction of the stockholder's personal business that fact may, in combination with other circumstances, justify a disregard of the corporate structure to reach the stockholder. Wormser in Disregard of the Corporate Fiction, page 79.
The prerequisites for application of the doctrine are indicated in Advertects, Inc. v. Sawyer Industries, Inc., Fla. 1955, 84 So.2d 21, wherein Justice Thornal, speaking for the court, said at page 24:
"* * * [I]n order to justify the issuance of a rule directing individual stockholders to show cause why they should not be held personally accountable for the corporation's debts, there should be a preliminary showing that the corporation is in actuality the alter ego of the stockholders and that it was organized or after organization was employed by the stockholders for fraudulent or misleading purposes, or in some fashion that the corporate property was converted or the corporate assets depleted for the personal benefit of the individual stockholders, or that the corporate structure was not bona fidely established or, in general, that property belonging to the corporation can be traced into the hands of the stockholders." (Emphasis added.)
Sirmons Supply Company, Inc., according to appellant's testimony before the trial court, was incorporated in 1955 with $10,000.00 paid-in capital. In June 1959 B.H. Sirmons purportedly paid in additional capital of $40,000.00. Corporate purposes were the retailing and wholesaling of building supplies, the hauling of goods and the purchasing of lands to be developed and improved for resale,  all of which tracked or duplicated the appellant's personal business activities. The corporation had interests in three subdivisions on which the appellant held first mortgages. On November 14, 1962, the interrogatories answered before the court indicated that there were $16,394.37 in accounts receivable with only $6.14 in the corporate bank account, while the major creditors of the corporation were listed as:
Notes payable to B.H. Sirmons [individually] $148,508.52
Arnold Lumber [appellee here] A/Pay $2,583.85
Florida Culvert A/Pay $2,685.35
I.W. Phillips A/Pay $3,505.88
St. Petersburg Independent $785.15
Sirmons Investment [notes] $54,110.00
Sirmons Construction [Notes] $3,127.94
Sirmons Investment $8,392.94
The record is not revealing as to certain specifics which, in the light of principles hereafter discussed, could bear importantly on plaintiff's case; for example, the dates *592 the listed debts were incurred and the complete financial status of the debtor corporation at the time the subject indebtedness was incurred.
The record reveals that appellant B.H. Sirmons owns 498 of the 500 shares of Sirmons Supply Company, Inc. He is president of this and six other corporations of which he is also essentially the sole stockholder. These corporations have the same secretary-treasurer, they operate from a single office and it is apparent that he conducted his overall business without reference to conventional or orthodox corporate lines. He became a creditor of the corporation and so conducted its affairs as to indicate preferment of himself to other creditors of the corporation. See e.g. The U.S. Supreme Court case of Pepper v. Litton, infra.
Appellant stated that he handled the business details, arranged loans and formed the various corporations so as to derive the economic benefits of intercorporate transactions. He testified that he loaned money from his personal account to carry on such business and to purchase lands which were placed in the corporate name. He took back various notes to evidence the "loans" and thereafter took back first mortgages to secure the corporate notes he had previously received; and the record strongly suggests that this was done while the corporate capital was at a low ebb. These methods could well have thinned the corporation and deprived it of clear assets of its own except bare titles encumbered far beyond their value, thus leaving the appellant in a secured position, or at least in a technically favored position as compared with other creditors of the corporation.
Portions of the appellant's testimony follow:
By the Court:
"Q. The notes you are referring to, in consideration of your refraining from calling those, they gave you the mortgage * * * were these notes from the corporation to you?
"A. Yes, sir.
"Q. And what was the aggregate amount of those?
"A. * * * I think it was one hundred and forty-nine thousand dollars.
"Q. Now, what did the corporation give you the note for originally?
"A. For monies that I had advanced the corporations to pay their bills with.
"Q. Personally?
"A. Personally, monies that I had taken out of my bank account and loaned to the corporation on notes payable on demand."
* * *
By Counsel:
* * *
"Q. And as a matter of fact, you have mortgages back from the corporation covering Oakgrove Manor, Whitewood Terrace, Golden Palms Manor and some other land, totaling approximately a hundred and forty-eight thousand dollars, did you not?
"A. I have a mortgage on the ground to secure the obligations.
"Q. Now, why were you interested in this corporation paying its debts?
* * * * * *
"A. The reason, because the corporation was chartered to engage in business as a profitable organization but it turned out to be a non-profit organization."
The testimony on supplemental proceedings further shows that subdivisions known as Oak Grove Manor and Whitewood Terrace had been sold by the debtor corporation subject to first mortgages held by the appellant individually and that subdivision Golden Palm Manor remained in the name of the Sirmons Supply Company, Inc., but *593 had been offered back to the mortgagee, not B.H. Sirmons, in view of the fact that the corporation could not pay for it and the land was not valued at what was owed on the mortgage. This offer purportedly was refused by the mortgagee because of certain tax consequences.
In Biscayne Realty & Ins. Co. v. Ostend Realty Co., 1933, 109 Fla. 1, 148 So. 560, the court observed at page 564:
"* * * If the stockholders of a corporation enter into a transaction in their individual and private interests, and utilize the name of the corporation merely as a convenience for the completion of the transaction, where the legal entity as such has no interest in the matter, but the name is used to mislead creditors or perpetrate a fraud upon them, the legal entity in the name of which the transaction was carried will be ignored and the parties held to individual liability."
The foregoing quotation was set forth with approval in Third Avenue Co. v. Keely, 1933, 111 Fla. 46, 149 So. 30, 32, wherein it was further stated:
"* * * A corporation so used will not be heard to say that property which it acquired ostensibly in its own name and upon its own responsibility is in fact the property of the owners of the corporation for whose sole benefit and individual profit in reality the property was acquired, the name of the corporation being used merely as the alter ego of the owners, all of which is concealed at the time from the persons who in such transactions become creditors of the corporation. In such a case, whether the judgment obtained is against the corporation, or the real owners of it to whose sole benefit the transaction resulted and for whom and in whose interest it was entered into, is immaterial; in such circumstances, the corporation is in fact and in law merely the owner of it under another name."
Inadequate capitalization may tend to justify disregard of the corporate entity. 63 A.L.R.2d 1051. In Ballantine on Corporations Rev.Ed. 1946, p. 302 the text reads:
"If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the corporate entity. * * * [S]hareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is ground for denying the separate entity privilege."
It cannot be concluded from the record that the initial capital of the subject corporation was inadequate but it is apparent that the corporation was grossly under-capitalized in relation to the extensive land investments and improvements with respect to which the instant indebtedness was incurred. This factual conclusion is fairly inferable from the record even though it is not disclosed in detail just how the original capital became depleted following the formation of the corporation in 1955.
In Anderson v. Abbott, 1944, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793, 151 A.L.R. 1146, rehearing denied 321 U.S. 804, 64 S.Ct. 845, 88 L.Ed. 1090, the opinion states:
"Normally the corporation is an insulator from liability on claims of creditors. The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose. * * * But there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied. Mr. Chief Judge *594 Cardozo stated that a surrender of that principle of limited liability would be made `when the sacrifice is so essential to the end that some accepted public policy may be defended or upheld.' * * * An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability. * * The Court stated in Chicago, M. & St. P.Ry. Co. v. Minneapolis Civic & Commerce Ass'n., [247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229] * * * that `the courts will not permit themselves to be blinded or deceived by mere forms of law' but will deal `with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.'" (Emphasis added.)
In Pepper v. Litton, 1939, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, the U.S. Supreme Court discusses dominant or controlling stockholders:
"* * * Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. * * * The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. * *
"* * * Thus, salary claims of officers, directors, and stockholders in the bankruptcy of `one-man' or family corporations have been disallowed or subordinated where the courts have been satisfied that allowance of the claims would not be fair or equitable to other creditors. And that result may be reached even though the salary claim has been reduced to judgment. It is reached where the claim asserted is void or voidable because the vote of the interested director or stockholder helped bring it into being or where the history of the corporation shows dominancy and exploitation on the part of the claimant. It is also reached where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own. And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan.

"Though disallowance of such claims will be ordered where they are fictitious or a sham, these cases do not turn on the existence or non-existence of the debt. Rather they involve simply the question of order of payment. At times equity has ordered disallowance or subordination by disregarding the corporate entity. That is to say, it has treated the debtor-corporation simply as a part of the stockholder's own enterprise, consistently with the course of conduct of the stockholder. But in that situation as well as in the others to which we have referred, a sufficient consideration may be simply the violation of rules of fair play and good conscience by the claimant; a breach of the fiduciary standards of conduct which he owes the corporation, its stockholders and creditors. He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and *595 in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation." (Emphasis added.)
The Court proceeded to reverse the Circuit Court of Appeals and affirmed the District Court decision, viz., In re Dixie Splint Coal Co., D.C. 1937, 31 F. Supp. 283, wherein the following portion of the District Court's opinion at page 288 is notable:
"* * * In all the experience of the law, there has never been a more prolific breeder of fraud than the one-man corporation. It is a favorite device for the escape of personal liability. This case illustrates another frequent use of the fiction of corporate entity, whereby the owner of the corporation, through his complete control over it, undertakes to gather to himself all of its assets to the exclusion of its creditors."
In the final analysis the question here is not whether the subject corporation was organized with intent to perpetrate fraud but whether the course of dealing after incorporation constituted an imposition upon the instant corporate creditor to the extent that the court was justified in ignoring the corporate form and determining personal liability of the appellant. It has been pointed out that some facets, notably the time element, should have been explored further so as to develop or negate the full fact pattern essential to plaintiff's case. The plaintiff did present a strong inference that the appellant, owning and controlling the corporation, knowingly used it or permitted it to be used for personal preferment at a time when the corporate capital was negligible and the corporate debts grossly exceeded the accounts receivable. cf. Codomo v. Emanuel, Fla. 1956, 91 So.2d 653.
I therefore agree with the principal opinion that the reversal should be without prejudice to further like proceedings.
ALLEN, Acting C.J., concurs.
NOTES
[1] The term "sole" is used advisedly. Singleness of ownership is not an absolute prerequisite. See e.g. Wormser page 79. It is the identity of the individual stockholder or stockholders with the corporate entity that is a matter of first concern. This character of the corporation ordinarily would not be altered by the fact that a few shares of stock were placed in other names in order to qualify for incorporation. Markell v. Hilpert, 1939, 140 Fla. 842, 192 So. 392.